NOT DESIGNATED FOR PUBLICATION

No. 121,089

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

BRETT D. BROWNBACK,
*Appellee*,

and

KYRA E. BROWNBACK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Linn District Court, TERRI L. JOHNSON, judge. Opinion filed May 8, 2020. Affirmed.

*Sara S. Beezley* and *Sarah A. Mills*, of Girard, for appellant.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellee.

Before GREEN, P.J., POWELL and SCHROEDER, JJ.

PER CURIAM: Brett Duane Brownback petitioned for divorce from Kyra Elaine Brownback. Following a bench trial, the district court ordered they share residency of K.B., the parties' minor son, finding this was in the child's best interests. Kyra now appeals the district court's shared residency order, arguing the district court abused its discretion. After a review of the record, we disagree and affirm.

1

This case has taken a long and winding path to our court, and the record is replete with changes of counsel, motions to compel discovery, numerous continuances, and repeated objections—in short, considerable conflict all too common in divorce proceedings. Much of the facts and procedural history of this case are not pertinent to the child residency issue before us and, therefore, need not be repeated as the parties are well acquainted with them. Instead, we will focus on the relevant facts bearing on the child residency issue.

Brett and Kyra began dating in college, roughly 7 years before they were married, and subsequently began living together in 2009 while still in college. They moved into their first house in 2012 and were married on September 20, 2014. K.B. was born in January 2017. Their marriage was not to be a long one.

On August 25, 2017, just before Brett was to file for divorce, Brett and Kyra got into an argument. According to Kyra's testimony at trial, Brett wanted to take K.B. to see his great-grandfather the next morning and leave at 5 a.m., but Kyra worried that was too early and offered to bring K.B. later in the day. Kyra also asked what Brett would do with K.B. when Brett was hauling cattle and K.B. was in the truck with no air conditioner. Kyra testified Brett was in a mental state that night that scared her.

Previously, there had been water on the kitchen floor from the freezer thawing, but Kyra had cleaned it up. Brett was holding a package of frozen food and threw it at Kyra. He then pushed Kyra into the kitchen cabinets, and Kyra hit her eye on the corner of the cabinet. Crying and bleeding, Kyra tried to get K.B. and leave the house, but Brett prevented her from taking the child. Kyra left the house alone. Because she was afraid Brett might hurt K.B., Kyra later returned with the police to collect K.B. and some of her

2

things. Brett was arrested and subsequently charged with domestic battery. Following the completion of an anger management course, the charge was dismissed.

Brett's recollection of these events is different. According to Brett, they were cleaning out the refrigerator because it had stopped working when he asked Kyra if it was okay if he took K.B. to his grandfather's the next morning. Kyra told Brett he could not take their son and K.B. would just stay with her. Brett asked Kyra why she thought he was a bad dad, and Kyra told him, "Your family doesn't deserve to see him." Brett had a package of thawed bacon in his hand and threw it against the cabinets behind her. Kyra spun around, slipped on the water that was all over the floor, and fell. Kyra was bleeding from a cut on her eye. Brett filled a baggie full of ice and tried to help her, but Kyra refused. Brett did not let Kyra take K.B. because Brett thought she was hysterical and would just throw him in the front seat of her car and take off flying down the driveway.

Kyra also testified to other incidents of domestic violence that occurred during their relationship. One night, when living together in college, Brett came home drunk and tried to enter Kyra's locked door while holding a knife. After K.B.'s birth, Kyra was standing by K.B. in his swing, and Brett began yelling at her. He pushed her, and, to keep from falling on K.B., Kyra fell into a cabinet and almost landed on their dog. Another time, while Kyra was sitting in a glider recliner holding K.B., Brett pushed the swing back and yelled in her face. Although Brett was not asked about those specific incidents, at trial Brett denied any other incidents of domestic violence occurred other than the one in their kitchen.

Brett filed a petition for divorce on August 28, 2017. As part of his divorce petition, Brett asked the district court to award joint legal custody of K.B. with Brett designated as the residential parent. Along with his petition, Brett asked the district court for an ex parte temporary order providing for a shared parenting time schedule based

3

upon Brett's proposed parenting plan. The district court issued the ex parte temporary order two days later, but it did not mention child custody.

On the same day Brett filed for divorce, in a separate case, Kyra sought a protection from abuse (PFA) order against Brett and obtained a temporary ex parte order granting her temporary residential custody of K.B. Kyra later dismissed her PFA. On September 11, Kyra answered Brett's divorce petition and counter-petitioned for divorce. Like Brett, she too sought residency of K.B.

The district court ordered Brett and Kyra to participate in mediation at their request. The district court also modified the temporary order and designated Kyra as the residential parent. But the district court's order allowed the parties to modify the parenting time schedule provided they mutually agreed. The district court also appointed a guardian ad litem (GAL) at Kyra's request to aid the parties in agreeing to a parenting plan.

Ultimately, the GAL proposed a parenting plan which granted Brett and Kyra joint legal custody with Kyra as the residential parent. This recommendation prompted Kyra to seek modification of the temporary order, and the district court held a hearing on Kyra's motion on January 14 and February 5, 2019. The hearing was continued until March 7 and 8, 2019, and the hearing on Kyra's motion was combined with the bench trial on the parties' divorce which would allow for a final determination of child custody and parenting time.

At the trial, both Brett and Kyra testified extensively about their marriage and parenting of K.B. Jessica Allison testified she provided Brett and Kyra with marriage counseling and Brett with anger management counseling. She stated she never saw Brett become angry or uncontrollable in their sessions. Jacob Crahan, one of the police officers who responded to the domestic violence incident, testified he noticed Kyra had cuts and

marks on her face. Following the bench trial, the district court took the matter under advisement. In the meantime, the district court ordered the parties to follow the GAL's proposed parenting plan.

The district court issued its child custody order on March 29, 2019. The district court considered the factors in K.S.A. 2018 Supp. 23-3201 to determine custody and residency of K.B. in accordance with the best interests of the child. The district court found Kyra's testimony not credible. In particular, the district court found the testimony about the fight at the refrigerator to be evidence that some domestic violence occurred during the marriage. The district court stated it had significant concerns that Brett and Kyra would not foster K.B.'s relationship with the other parent's extended family. Brett and Kyra were ordered to communicate exclusively through Our Family Wizard—a messaging platform for parents—to limit messages to one per day and required the parties to respond to a message within 24 hours of receipt. The district court ordered joint legal custody of K.B. to Brett and Kyra, but, contrary to the GAL's recommendation, it refused to designate a residential parent due to concerns that the residential parent would use the child's residency as a weapon against the other parent. Instead, the district court ordered a shared parenting time schedule with the parties to alternate weekly K.B.'s residency. The child would spend one week with Brett and then one week with Kyra. During the week K.B. resided with one parent, the other parent would exercise parenting time on Tuesday from 2:30 p.m. to 7 p.m.

Kyra filed a timely notice of appeal on April 8, 2019.

Following the filing of her notice of appeal, Kyra sought reconsideration of the district court's child residency order. However, prior to the district court ruling on Kyra's motion, she filed her docketing statement with our court and perfected her appeal. As a consequence, the district court ruled on June 26, 2019, that it lacked jurisdiction to consider Kyra's motion but made additional factual findings in case our court disagreed.

The next day the district court issued a decree granting the divorce. On July 26, 2019, Kyra filed an Amended Notice of Appeal based on the district court's June 26 order.

## DID SUBSTANTIAL EVIDENCE SUPPORT THE DISTRICT COURT'S ORDER FOR SHARED RESIDENCY OF K.B.?

Kyra argues on appeal the district court abused its discretion with its shared residency order because the evidence presented at trial did not support the district court's weighing of the factors in K.S.A. 2019 Supp. 23-3203. Specifically, Kyra argues a district court should not order shared residency when the parties do not communicate well and are not committed to cooperating to make shared residency work—a difficult task for her and Brett by her own admission. Kyra also argues the evidence in the record, especially the evidence of domestic violence, when applied to the factors in K.S.A. 2019 Supp. 23-3203 supports granting her residency of K.B. instead. Not surprisingly, Brett disputes this analysis and counters Kyra is improperly asking us to reweigh the evidence.

"'When an initial custody issue lies only between the parents, the paramount consideration of the court is the welfare and best interests of the child.'" *Cheney v. Poore*, 301 Kan. 120, 128, 339 P.3d 1220 (2014). The district court is in the best position to make this determination, and its judgment will not be disturbed absent an abuse of discretion. An abuse of discretion exists when the district court's action (1) is one where no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. 301 Kan. at 128. The party alleging an abuse of discretion occurred has the burden to establish an abuse of discretion existed. *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

> "'[Our] function is not to delve into the record and engage in the emotional and analytical tug of war between two good parents over [their child]. The district court [is] in a better position to evaluate the complexities of the situation and to determine the best interests of

the child []. Unless we were to conclude that no reasonable judge would have reached the result reached below, the district court's decision must be affirmed.' *In re Marriage of Bradley*, 258 Kan. 39, 45, 899 P.2d 471 (1995)." *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 701, 229 P.3d 1187 (2010).

When an appellant challenges the sufficiency of the evidence used to support a district court's findings regarding a child's best interests, we review "the evidence in a light most favorable to the prevailing party below to determine if the court's factual findings are supported by substantial competent evidence and whether those findings support the court's legal conclusion." 43 Kan. App. 2d at 704. Substantial evidence is any "'legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. . . . [We do] not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *Geer v. Eby*, 309 Kan. 182, 190-91, 432 P.3d 1001 (2019).

Here, the district court declined to name a residential parent because it feared the residential parent would use that fact against the nonresidential parent. Instead, the district court ordered shared residency of K.B. The district court's parenting plan required K.B. to alternate weekly residency with each parent, with the nonresidential parent exercising parenting time on Tuesday from 2:30 p.m. to 7 p.m.

Kyra first argues the district court erred by ordering shared residency when it was clear the parents could not cooperate in parenting K.B. Kyra cites to a number of cases and an academic treatise by Linda D. Elrod to support her argument that shared residency should not be ordered without cooperative parents. See 2 Elrod, Kansas Law and Practice: Kansas Family Law § 12:14 (2018-19 ed.). But the cases Kyra cites do not support that argument. Kyra first relies on *In re A.F.*, 13 Kan. App. 2d 232, 767 P.2d 846 (1989), for its discussion on shared residency. But *A.F.* is distinguishable because the issue there involved statutorily required permanency planning for a child after the

7

termination of parental rights and the shared residency involving monthly transitions between two sets of grandparents. Our case involves a different statute and two parents who retain their parental rights.

Kyra also relies upon *In re Marriage of Davis*, No. 109,756, 2014 WL 802300 (Kan. App. 2014) (unpublished opinion), and *In re Marriage of Malan and Packard*, No. 98,109, 2007 WL 3085368 (Kan. App. 2007) (unpublished opinion), to show certain district courts take the position that shared residency is not in the best interests of the child. But in neither case did the district court nor our court find shared residency is never appropriate. Instead, the district courts took fact-specific approaches to the cases before them and found shared residency was not appropriate under the facts of those cases. Our court affirmed, finding the district courts' decisions did not amount to an abuse of discretion. *Davis*; 2014 WL 802300, at *3; *Malan*, 2007 WL 3085368, at *2.

Kyra tries to persuade us these cases establish that shared residency is an abuse of discretion when the parents do not want a shared arrangement, as is the case here. We disagree. The legal standard is what is in the best interests of the child and whether the district court's determination of those best interests is one with which a reasonable person could agree. Only if no reasonable person could agree with the district court's judgment may we set it aside. See *Cheney*, 301 Kan. at 128.

Kyra makes the argument the evidence did not support the district court's findings on the factors listed in K.S.A. 2019 Supp. 23-3203. K.S.A. 2019 Supp. 23-3203(a) lists the factors a district court must use to determine residential custody of a child:

> "In determining the issue of legal custody, residency and parenting time of a child, the court shall consider all relevant factors, including, but not limited to:
>
> "(1)    Each parent's role and involvement with the minor child before and after separation;

"(2)     the desires of the child's parents as to custody or residency;

"(3)     the desires of a child of sufficient age and maturity as to the child's custody or residency;

"(4)     the age of the child;

"(5)     the emotional and physical needs of the child;

"(6)     the interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

"(7)     the child's adjustment to the child's home, school, and community;

"(8)     the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

"(9)     evidence of domestic abuse, including, but not limited to:

         (A) A pattern or history of physically or emotionally abusive behavior or threat thereof used by one person to gain or maintain domination and control over an intimate partner or household member; or

         (B) an act of domestic violence, stalking or sexual assault;

"(10)    the ability of the parties to communicate, cooperate and manage parental duties;

"(11)    the school activity schedule of the child;

"(12)    the work schedule of the parties;

"(13)    the location of the parties' residences and places of employment;

"(14)    the location of the child's school;

"(15)    whether a parent is subject to the registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law;

"(16)    whether a parent has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 21-5602, and amendments thereto;

"(17)    whether a parent is residing with an individual who is subject to registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law; and

"(18)    whether a parent is residing with an individual who has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 21-5602, and amendments thereto."

Kyra goes through the factors she believes apply and discusses how the evidence tilts these factors in favor of her being awarded residency of K.B. But Kyra fails to show how the district court's findings are unsupported by substantial evidence. Instead, she focuses her argument on how the statutory factors weigh in her favor. The problem with her argument is that she is asking us to reweigh the evidence and award her residency. That is not our role. See *In re Marriage of Whipp*, 265 Kan. 500, 502, 962 P.2d 1058 (1998) ("[A]n appellate court should only look to evidence supporting the decision of the trial court and determine if there was an abuse of discretion.").

Moreover, a district court need not make specific factual findings on the record about each factor listed in K.S.A. 2019 Supp. 23-3203. See *In re Marriage of Dacus*, No. 116,124, 2017 WL 2403345, at *6 (Kan. App. 2017) (unpublished opinion). Instead, the district court is to determine which of the statutory factors apply and consider how they bear on the child custody question at issue. The district court should analyze all relevant factors, but its final order does not need to "catalogue each of them or recapitulate in detail the evidence pertinent to each." *Peralta-Diaz v. Ortega*, No. 120,291, 2020 WL 593938, at *8 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* March 9, 2020; see *Vandenberg*, 43 Kan. App. 2d at 703.

To determine if substantial evidence exists to support the district court's order, we examine the reasons provided in the district court's custody order and analyze the record to determine if there is substantial evidence to support those findings. In this case, there are two orders to consider:  the original custody order and the order on Kyra's motion to reconsider. Following the district court's custody order, Kyra filed a notice of appeal and then a motion asking the district court to reconsider its findings. The district court eventually issued an order denying Kyra's motion to reconsider based on its lack of jurisdiction but also provided additional reasoning for its original custody award. Because Kyra had already filed a notice of appeal to this court, there is a question whether the district court had jurisdiction to issue another order.

10

The filing of a timely notice of appeal and docketing of that appeal with an appellate court divests the district court of jurisdiction in the case. In the time between the filing of a notice of appeal and its docketing, the district court and appellate court have simultaneous jurisdiction, but once the appeal is docketed the district court loses its jurisdiction over the case. At that point, only the appellate court has jurisdiction to change the district court's order. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34-35, 392 P.3d 82 (2017).

Here, the district court filed its custody order on March 29, 2019. Kyra filed a timely notice of appeal on April 8, 2019, and her motion to reconsider on April 18, 2019. Kyra perfected her appeal by filing her docketing statement on April 24, 2019. At this point, the district court lost its jurisdiction to hear her motion. In its order on the motion to reconsider, the district court noted that it lacked jurisdiction to modify its custody order. But, in an abundance of caution, it went on to make additional factual findings. The district court was correct that it lacked jurisdiction to modify its custody order. Therefore, its additional findings were made without jurisdiction and cannot be considered by us. Our determination of whether substantial evidence supports the district court's findings must rise and fall on the findings made in the district court's original child custody order.

In its child custody order, the district court listed the nonexhaustive statutory factors found in K.S.A. 2019 Supp. 22-3203 and specifically found the parties did not present any evidence about the last four factors—all of which involved child abuse or offender registration requirements. The district court stated it considered all the evidence including the testimony and exhibits in reaching its custody decision.

The district court noted the difficulties it and the parties had in establishing a parenting time schedule. Although the district court did not go through the statute factor by factor, a reading of the order reveals the district court discussed several factors.

*K.S.A. 2019 Supp. 23-3203(a)(5)—Emotional and physical needs of the child*

The district court found that pictures admitted into evidence showed a thriving child who was happy in both parents' care.

*K.S.A. 2019 Supp. 23-3203(a)(6)—Interaction of the child with family*

K.B. is an only child but has a large extensive family living nearby. The district court found shared residency appropriate because neither parent seemed to foster K.B.'s relationships with the other parent's extended family. Kyra testified about the problems she had with Brett's family. She believed Brett's family did not like her and was too controlling of K.B. According to Kyra, when she and Brett were still living together, Brett's parents would walk in unannounced, wake up K.B. from his nap, and only focus on him while ignoring her. Brett testified Kyra's dad was an alcoholic and the relationship between Kyra's parents had problems. From the testimonies of both parents, it is apparent both Brett and Kyra had poor relationships with the other's families. The district court worried that neither party appreciated the positive role that extended families could play in K.B.'s life and ordered shared residency in hopes the parties would realize the benefits of a close extended family. This strikes us as a reasonable conclusion.

*K.S.A. 2019 Supp. 23-3203(a)(8)—Willingness of each parent to respect the child's bond with the other parent*

Both Brett and Kyra acknowledged the other was a good parent and it was good for K.B. to spend time with each parent, but, when the rubber hit the road, both Brett and Kyra struggled to work with each other to develop a parenting plan. The district court noted Brett testified Kyra was a great mom but was controlling and overreaching and did not believe Kyra supported him being an active member in K.B.'s life. Kyra admitted Brett should probably see K.B. more but she worried he would not take care of K.B.

12

appropriately. The district court believed Kyra wanted Brett to have a relationship with K.B. only on her terms and noted Kyra repeatedly referred to K.B. as "her" son. Additionally, Brett seemed to want to control Kyra as exhibited by his demand to know where his son was when in Kyra's care.

*K.S.A. 2019 Supp. 23-3203(a)(10)—Ability of parents to communicate and cooperate*

The district court noted the parties struggled to communicate with each other and highlighted the fact there was considerable difficulty in establishing a parenting time schedule. The district court ordered Brett and Kyra to communicate exclusively through Our Family Wizard, a communication program for parents, yet noted the problems the parties had with timely responses on the program. The exhibits of conversations on Our Family Wizard revealed delays in responding to messages and repeated requests asking to switch parenting times on the same day. Accordingly, the district court limited messages to one per day and ordered any message to be responded to within 24 hours. There is sufficient evidence to support the district court's finding of communication issues between the parties.

*K.S.A. 2019 Supp. 23-3203(a)(9)—Evidence of domestic violence*

Kyra accuses the district court of minimizing the domestic violence. A review of the record shows conflicting evidence concerning any domestic violence. As to the incident where Brett threw a package of bacon at Kyra, the parties' stories differed significantly. Kyra testified Brett hit her in the head with the bacon package and pushed her into the cabinets, injuring her. Brett admitted they argued but claimed he threw a package of bacon in her direction and that it hit the cabinet, not her. Kyra spun around and fell because the floor was wet, hurting herself. However, the record also shows Brett was arrested and charged with domestic battery, but the charges were later dismissed after Brett successfully completed an anger management class. Additionally, Kyra sought

a protection from abuse order and was even granted a temporary protection order, but she later dropped her claim. Kyra also testified about several other incidents of domestic violence, but Brett denied there were any other incidents.

The district court did not minimize any domestic violence. The district court concluded at a minimum there was some evidence of domestic violence, given the testimony of both parties and the bacon package throwing incident, while acknowledging more domestic violence could exist. The evidence supports the district court's finding. Brett acknowledged he was angry and threw a package of bacon at Kyra. He acknowledged the incident led to Kyra being injured. While Kyra testified about other incidents, Brett denied them. Because the criminal case was dropped and Brett's counselor did not recommend any additional anger management counseling or treatment, the district court did not order any additional treatment.

Because there is sufficient evidence to support the district court's findings, our final question is whether the district court's decision was an abuse of discretion. The district court worried that whoever was designated as the residential parent would use that as a weapon over the other parent as both parties sought to control the other parent's time with K.B. The GAL expressed the same concern. The district court ordered shared residency to prevent that situation from happening. While we appreciate that reasonable people could disagree with the district court's decision in this case, considering the evidence, we cannot conclude that no reasonable person would agree with the district court's shared residency order as being in K.B.'s best interests. There was no abuse of discretion by the district court.

Affirmed.